MICHELLE ZAMARIN (DC Bar #474042)
Email: ZamarinMi@SEC.GOV
Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 793-0656
Attorneys for Plaintiff
Securities and Exchange Commission

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Securities and Exchange Commission, | Case No. |
| Plaintiff, | |
| vs. | **COMPLAINT** |
| Christopher E. Galvin, | **JURY DEMAND** |
| Defendant. | |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Defendant Christopher E. Galvin ("Galvin" or "Defendant"), alleges as follows:

## SUMMARY

1. Christopher Galvin engaged in an offering fraud by making material misrepresentations to prospective investors—and omitting material facts necessary to make his representations not misleading—as part of a scheme to deceive investors and misappropriate their money. From at least March 2019 through at least November 2019, Galvin, acting through Hypur Ventures II, L.P., a limited partnership investment fund he created and controlled, solicited and raised money through deceptive means and then misappropriated $500,000 from two investors.

COMPLAINT

2.  To solicit investors, Galvin caused the creation and dissemination of and signed offering documents for limited partnership interests in Hypur Ventures II, L.P.  These offering documents included two key misrepresentations.  First, they falsely represented that the general partner of the investment fund, Hypur Ventures II G.P., LLC (the "General Partner"), which Galvin also created and controlled to manage the fund, would be responsible for paying its own overhead, including personnel costs.  Second, they misrepresented that investors' money would be pooled and invested in cannabis-related companies that were selected by an experienced investment committee in return for debt or equity in those businesses, with the intention of generating positive returns for investors.  Galvin also orally told one investor that their funds would be invested in cannabis-related companies.

3.  In truth, the General Partner had no start-up capital to launch the fund or to pay for initial operating costs, which neither Galvin nor the offering documents disclosed to investors.  As Galvin knew or was reckless or negligent in not knowing, some or all investors' money would be used to pay the General Partner's operating expenses.

4.  Moreover, Galvin did not actually *invest* any investor money as he promised.  Instead, he transferred any money that he did not use to pay the General Partner's operating expenses to a cannabis related business ("Company X") of which Galvin was the chief executive officer and chairman and in which he had a substantial ownership interest.  Hypur Ventures II, L.P., however, did not receive securities or any other form of consideration from or enter into any investment agreement with Company X in return for its investors' money.  Those transfers had the effect of bolstering Company X's finances, and by extension Galvin's, without securing any benefit for Hypur Ventures II, L.P. or its investors.

5.  By reason of his conduct and as alleged further herein, Defendant Galvin violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15

U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5].

## JURISDICTION AND VENUE

6. The Court has jurisdiction over this action pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)], and Sections 21(d)(1) and 21(d)(5) of the Exchange Act [15 U.S.C. §§ 78u(d)(1) and 78u(d)(5)].

7. Venue is proper in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], and Sections 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 77u(e) and 78aa] because the Defendant resides in the District of Arizona and many of the transactions, acts, practices, courses of business, and Defendant's misappropriations alleged in this Complaint occurred within the District of Arizona.

## DEFENDANT

8. Christopher Galvin, age 57, is a resident of Scottsdale, Arizona, and, at all times relevant to the allegations herein, held himself out as the founder and managing director of Hypur Ventures II G.P., LLC ("Hypur Ventures II G.P." or the "General Partner"), a Delaware limited liability company, which was solely responsible for the management and investment activities of Hypur Ventures II, L.P. ("Hypur Ventures II, L.P."), a Delaware limited partnership.

## ALLEGATIONS OF FACTS

**A.     The Creation of Hypur Ventures II, L.P.**

9. In or about March 2019, Galvin formed Hypur Ventures II, L.P., a private equity investment fund that was purportedly created to invest in cannabis-related companies. Galvin also created the General Partner, which was supposed to manage and operate Hypur Ventures II, L.P.  Although the General Partner had three other directors, Galvin, as its founder and managing director, controlled both it and, by extension, Hypur Ventures II, L.P.

10.     Galvin operated Hypur Ventures II, L.P., and the General Partner, from the offices of Company X, in Scottsdale, Arizona.

11.     Hypur Ventures II, L.P., which had no employees, was supposed to receive and hold investor money, as well as the debt and equity securities that the fund would obtain when it made investments. Investors in the fund became limited partners in Hypur Ventures II, L.P. The limited partners were passive investors who had no involvement in investment decisions and relied entirely on the managerial efforts of Galvin and the General Partner to generate profits.

12.     On or about March 28, 2019, Galvin issued or directed the issuance of a press release publicizing the creation of Hypur Ventures II, L.P. to "strategically enhance value through investments in well-managed revenue-generating businesses." The press release quoted Galvin, claiming that Hypur Ventures II, L.P. would be "investing in experienced operators and companies with strong growth and defensible business models . . .."

**B.     Galvin's Misrepresentations and Omissions to Investors**

13.     Galvin solicited investors in Hypur Ventures II, L.P., in part, by distributing, or causing the distribution of, offering documents and other materials to investors. These materials included: a Private Placement Memorandum (PPM), titled "Business Overview"; a Limited Partnership Agreement (LPA); a Subscription Agreement; and the press release described above. The PPM provided a general informational overview of the business operations of Hypur Ventures II, L.P. The LPA set forth the rights and obligations of the General Partner and the limited partners, *i.e.,* investors, in the operation of Hypur Ventures II, L.P. The Subscription Agreement outlined the terms and conditions of the exchange of the investor's capital for a limited partnership interest in Hypur Ventures II, L.P. and incorporated the LPA. By signing the Subscription Agreement, an investor agreed to be bound and become party to the LPA in effect at the time the Subscription Agreement was signed. Each time an agreement was

finalized between the General Partner and an investor, Galvin, on behalf of the General Partner, signed the Subscription Agreement.

14. As Galvin knew or was reckless or negligent in not knowing, both the PPM and the LPA were materially misleading and included false representations at the time they were distributed to investors. The PPM included material misrepresentations when it stated that:

    a) Hypur Ventures II, L.P. would receive "[e]quity or equity related securities" as well as "[d]ebt or debt-related securities" of the portfolio companies in which it invested;

    b) the investors in Hypur Ventures II, L.P. would be "charged an annual management fee of 2% of the Fund's assets and an incentive allocation of 20% of Fund profits"; and

    c) the General Partner's principals (i.e., the directors) would constitute the members of the "Investment Committee."

15. The LPA included material misrepresentations when it stated that:

    a) Hypur Ventures II, L.P. "shall provide venture capital financing, in such amounts and on such terms as the investment committee of the General Partner shall determine . . . in start-up and growth stage companies ('Portfolio Companies') that the investment committee believes will provide a high return on investment";

    b) "No Investment shall be made, and no firm commitment to make any Investment shall be made, unless and until the General Partner approves the following characteristics of such Investment: (i) the Portfolio Company; and (ii) the form of financing"; and

    c) Hypur Ventures II, L.P. "shall not have any salaried personnel. The General Partner, and not [Hypur Ventures II, L.P.] will pay

all of its own overhead expenses, including but not limited to the salaries of its own personnel, and accounting and bookkeeping expenses."

16. Each of these misrepresentations was material because they gave assurance that only a small amount of investor money would be paid to the General Partner and that the balance would be invested based on a determination made by a group of professionals after careful review, both of which would be important to investors' decision making.

17. Galvin knew, or was reckless or negligent in not knowing, that these representations were false. As the Founder and Managing Director of the General Partner, Galvin knew or was reckless or negligent in not knowing that the General Partner had no start-up capital to pay its own overhead expenses, a fact that was not disclosed in the offering documents. He also knew or was reckless or negligent in not knowing that Hypur Ventures II, L.P. would pay the General Partner more than 2% of its assets annually in order to cover the General Partner's expenses. Finally, he knew or was reckless or negligent in not knowing that investor money would not be directly invested in a cannabis-related business after selection by the investment committee but rather that he would use the money to pay the expenses of the General Partner and/or outright transfer it to Company X.

**C.      Galvin's Misappropriation of Investors' Money**

18. On or about March 27, 2019, a prospective investor ("Investor A"), received an email from the General Partner that included a link to a Fund Investment Package that contained the PPM and Subscription Agreement. After receiving these materials, Investor A, along with his spouse, invested in Hypur Ventures II, L.P., with the goal of earning a return on the investment.

19. On or about April 18, 2019, Investor A and his spouse executed the Subscription Agreement which incorporated the LPA in effect as of April 18, 2019.  That same day, Investor A wired $400,000 to a Hypur Ventures II, L.P.

bank account maintained at a branch in Scottsdale, Arizona, that Galvin had opened and which he controlled (the "Scottsdale Account"). On May 21, 2019, Investor A returned the signature pages to the April 18, 2019 LPA. Galvin signed both the Subscription Agreement and the LPA on behalf of the General Partner.

20. On or about April 18, 2019, shortly after Investor A wired money to the Scottsdale Account, Galvin misappropriated most of it by transferring $350,000 of the $400,000 to Company X. When Galvin transferred the money, he did so without seeking or obtaining any equity or debt security, as described in the PPM, or any other consideration from Company X for Investor A's money. By failing to obtain the approval of the investment committee, to negotiate the terms of the transfer with Company X, or to seek any consideration in return for the transfer of funds, Galvin knowingly, recklessly, or negligently misappropriated the $350,000.

21. In further violation of the representations in the LPA, Galvin misappropriated the remaining $50,000 of Investor A's investment by using the money for personnel costs of the General Partner. Specifically, despite the representations in the LPA that no money from Hypur Ventures II, L.P. would be used to pay expenses related to the General Partner, Galvin used the money to pay for salaries and other expenses.

22. In or around May 2019, Galvin met with another investor ("Investor B") in her California home. In this meeting, Galvin falsely represented to Investor B that her funds would be pooled with other investors' money and used to invest in cannabis-related businesses. Galvin also falsely told Investor B that she could expect a return on the investment in the next couple of years. Finally, Galvin failed to disclose information that would have been material to Investor B's decision whether to invest in Hypur Ventures II, L.P. when he omitted that: (1) Galvin had already misappropriated most of Investor A's funds, which also

constituted all prior investments in Hypur Venture II, L.P.; and (2) the General Partner had no funds to cover its expenses.

23.   Galvin made each of these misrepresentations or misleading omissions knowingly, recklessly, or negligently. He knew the truth – Investor B's money would not be used to invest but instead would be misappropriated in the same way as Investor A's money and used in a manner contrary to the offering documents.

24.   On or around May 30, 2019, Galvin caused the offering documents, including the PPM, investment subscription documents, and the LPA, to be emailed to Investor B.  After hearing Galvin's oral representations and reviewing the documents, Investor B invested in Hypur Ventures II, L.P., with the goal of earning a return on this investment.

25.   On or about June 17, 2019, Investor B executed the Subscription Agreement, which incorporated the LPA, and related documents and returned them to the General Partner.  Galvin signed the Subscription Agreement on behalf of the General Partner.

26.   On June 19, 2019, Investor B wired $100,000 to the Scottsdale Account. Shortly after Investor B wired money to the Scottdale Account, Galvin misappropriated most of those funds by using Investor B's money to pay the General Partner's personnel costs and legal and travel expenses, despite knowing, or being reckless or negligent in not knowing, that the LPA prohibited the use of investor funds for such expenses. Galvin also directed transfers of Investor B's money to himself and to another company he controlled.  Following his misappropriation of Investor B's monies to pay the General Partner's personnel costs and other expenses, Galvin repeatedly assured Investor B that her funds had been invested in Company X, which he knew or was reckless or negligent in not knowing, was false.

27. By on or about November 2019, despite the representations in the PPM, LPA, the press release, and other documents he created or caused to be created, Galvin had not invested any of the investors' money. In fact, Hypur Ventures II, L.P. had no assets after Galvin spent or misappropriated all of the investors' money.

28. As a result of Galvin's misrepresentations and fraudulent scheme, Investors A and B lost the entire amount of their investments.

## FIRST CLAIM FOR RELIEF

### Violations of Securities Act Section 17(a)

29. The Commission re-alleges and incorporated by reference here the allegations in paragraphs 1 through 28.

30. Defendant, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly has employed one or more devices, schemes or artifices to defraud, (2) knowingly, recklessly, or negligently has obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) knowingly, recklessly, or negligently has engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

31. By reason of the foregoing, Defendant, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF

### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder

32. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 28.

33. Defendant, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly has (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

34. By reason of the foregoing, Defendant, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court:

### I.

Issue finding of fact and conclusions of law that Defendant committed the violations alleged herein.

### II.

Issue a judgment, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendant and his agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Securities Act Section 17(a)(1) [15 U.S.C. §§ 77e(a)], Exchange Act Section 10(b) [15 U.S.C. §§ 78j(b)], and Rule 10b-5(b), thereunder [17 C.F.R. §§ 240.10b-5(b)];

### III.

Order Defendant to disgorge all ill-gotten gains he received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations,

pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

///

### IV.

Ordering Defendant to pay an appropriate civil penalty under Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)];

### V.

Permanently prohibiting Defendant from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)];

### VI.

Permanently enjoining Defendant from directly or indirectly, including, but not limited to, through any entity owned or controlled by Defendant, participating in the issuance, purchase, offer, or sale of any security, provided however, that such injunction shall not prevent Defendant from purchasing or selling securities for his own personal account; and

### VII.

Granting such other and further relief as this Court may deem just and proper.

# JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the SEC hereby requests a trial by jury.

Dated: March 22, 2024

                                           */s/ Michelle A. Zamarin*
                                           Michelle A. Zamarin
                                           Attorney for Plaintiff
                                           Securities and Exchange Commission